UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DONEL DAVIDSON, Derivatively on Behalf of L BRANDS, INC., | ) ) | Case No. 20-cv-926 |
| | ) | |
| Plaintiff, | ) ) | Judge |
| | ) | |
| v. | ) ) | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT |
| LESLIE H. WEXNER, STUART B. BURGDOERFER, ALLAN R. TESSLER, RAYMOND ZIMMERMAN, ABIGAIL S. WEXNER, DONNA A. JAMES, E. GORDON GEE, MICHAEL G. MORRIS, STEPHEN D. STEINOUR, PATRICIA S. BELLINGER, ROBERT H. SCHOTTENSTEIN, DAVID T. KOLLAT, and DENNIS S. HERSCH, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| L BRANDS, INC., an Delaware corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant L Brands, Inc. ("L Brands" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in billions of dollars in damages to L Brands' reputation, goodwill, and standing in the business community. Moreover, these actions have exposed L Brands to billions of dollars in potential liability for violations of state and federal law.

2.      L Brands is a fashion retailer company founded by defendant Leslie H. Wexner ("L. Wexner") in 1963. The Company operates in three segments: (i) Victoria's Secret; (ii) Bath & Body Works; and (iii) Victoria's Secret and Bath & Body Works International. The Victoria's Secret business segment, which include the brands Victoria's Secret and PINK, is L Brands' key business segment, accounting for more than one-half of the Company's total revenue.

3.      In 2015, Victoria's Secret began to experience declining operating performance largely due to increased competition from new lingerie and women's apparel brands. As a result, the Company suffered from significant customer base and market share losses. In response, L Brands engaged in heavy promotional activity by offering consumers large discounts and even

giving away items free of charge. The Company then announced in 2016 a strategic decision to exit certain Victoria's Secret categories to focus "resources on core merchandise categories." L Brands also eliminated the Victoria's Secret catalog, which had an annual circulation to nearly 250 million households, resulting in a material loss of business. These strategies negatively impacted the Company's financial performance.

4.      As a result of the growth in competition and the strategic decisions to exit retail categories, eliminate the catalog, and offer heavy promotions, L Brands' revenue growth rate, income growth rate, and operating cash flow began to plummet. Specifically, its adjusted operating income growth fell from 12% to -15% between 2015 and 2017. Its adjusted net income growth fell from 14% to -16% between 2015 and 2017. The Company's revenue growth fell from 6.1% to 0.5% between 2015 and 2017. Finally, its operating cash flow fell from $2.027 billion to $1.406 billion during the same period. Consequently, L Brands' stockholders' deficit (its negative book value) nearly tripled, from $259 million on January 30, 2016 to $753 million on February 3, 2018. Several analysts repeatedly underscored how the financial distress within the Victoria's Secret business segment adversely impacted the Company's overall financial performance. Analysts also observed that intensifying competition, increasing industry pricing pressure, declining merchandising margins, market share losses, and weak comparable store sales continued to plague the Company.

5.      Yet, despite the mounting financial problems, the Company's Board of Directors (the "Board") chose to maintain and even increase L Brands' annual dividend. As described in its annual and quarterly SEC filings, L Brands' Board set the Company's dividend. However, the Board did not act independently when doing so, given that majority of the Board members had close affiliations with defendant L. Wexner, the Company's largest principal stockholder, Chief

Executive Officer ("CEO"), and Founder. Notably, defendant L. Wexner has been in talks to step down from his position at the Company, which he has held for fifty-seven years. Facing retirement, he decided to increase the dividend in recent years at the expense of the Company and its long-term growth. Given his control over the Board due to his position and his close personal and professional relationships with them, the Board agreed. As L Brands' principal stockholder, defendant L. Wexner has been the biggest beneficiary of the dividend, receiving approximately $197 million from the dividend in 2016, approximately $111 million in 2017, and approximately $113 million in 2018.

6. After payment of the dividend, the Company's cash flow declined by more than half in recent years, from $1.44 billion in 2015 to only $720 million in 2017. L Brands was therefore left with limited financial ability to fund its ongoing operations, finance its capital expenditure requirements, and manage its multi-billion dollar debt level. Thus, by several common measures, the Company's dividend was placing a financial strain on the Company. Its key business, Victoria's Secret, had been deteriorating rapidly with little expectation of reversal. As a result, there was a substantial risk the dividend would need to be reduced, particularly because L Brands needed to reduce its high debt level in order to maintain or improve its credit rating.

7. Nevertheless, the Company's fiduciaries continued to make improper statements in SEC filings, press releases, and public communications that trivialized the risk that L Brands would need to cut its dividend, misleadingly representing that the dividend was safe for the foreseeable future.

8. The truth about the effect the Company's deteriorating financial prospects had on its ability to sustain the dividend emerged on November 19, 2018, when L Brands issued a press

release announcing its financial results for the third quarter of 2018. In the press release, the Company announced its intention to reduce its annual ordinary dividend by half, from $2.40 to $1.20, in order to deleverage L Brands' balance sheet over time.

9.     In the wake of the November 19, 2018 disclosure, L Brands' stock plunged more than 17%, or $6.12 per share on November 20, 2018, to close at $28.43 per share compared to the previous trading day's closing of $34.55 per share, erasing almost $1.7 billion in market capitalization.

10.     Further, as a direct result of this unlawful course of conduct, L Brands is now the subject of a consolidated federal securities class action lawsuit filed in the United States District Court for the Southern District of Ohio on behalf of investors who purchased L Brands' shares. The securities class action brings claims against L Brands and certain of the Individual Defendants (defined *infra*) in connection with the Company's improper statements, including causes of action under sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act").

## **JURISDICTION AND VENUE**

11.     Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) L Brands maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to L Brands, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

14.     Plaintiff Donel Davidson was a stockholder of L Brands at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current L Brands stockholder.  Plaintiff is a citizen of Texas.

**Nominal Defendant**

15.     Nominal defendant L Brands is a Delaware corporation with principal executive offices located at Three Limited Parkway, Columbus, Ohio.  Accordingly, L Brands is a citizen of Delaware and Ohio.  L Brands operates specialty retail businesses focused on women's intimate and other apparel, personal care, beauty and home fragrance products.  L Brands sells its merchandise through company-owned specialty retail stores in the United States, Canada, the United Kingdom, Ireland and China, through websites; and through international franchise, license and wholesale partners.  As of February 2, 2019, the Company had approximately 88,900 employees, 63,400 of whom were employed part-time.

**Individual Defendants**

16.     Defendant L. Wexner is L Brands' Chairman of the Board and has been since 1975, and Chief Executive Officer and has been since founding the Company in 1963. Defendant L. Wexner is the husband of defendant Abigail S. Wexner ("A. Wexner"). Defendant L. Wexner is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant L. Wexner knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations. L Brands paid defendant L. Wexner the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------------------------------------------------------|------------------------|-------|
| 2018 | $1,000,000 | $952,729 | $244,137 | $1,383,900 | $638,289 | $334,255 | $4,553,310 |

Defendant L. Wexner is a citizen of Ohio.

17.     Defendant Stuart B. Burgdoerfer ("Burgdoerfer") is L Brands' Executive Vice President and Chief Financial Officer and has been since April 2007. Defendant Burgdoerfer is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Burgdoerfer knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations. L Brands paid defendant Burgdoerfer the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|-------------------------------------------------------------------------|------------------------|-------|
| 2018 | $900,000 | $1,748,530 | $117,737 | $1,411,578 | $79,008 | $260,080 | $4,516,933 |

Defendant Burgdoerfer is a citizen of Ohio.

18.     Defendant Allan R. Tessler ("Tessler") is an L Brands director and has been since 1987. Defendant Tessler was also L Brands' Lead Independent Director from at least April 2018 to at least April 2019. Defendant Tessler is a member of L Brands' Audit Committee and has been since at least April 2018. Defendant Tessler knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations. L Brands paid defendant Tessler the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2018 | $194,400 | $169,427 | $363,827 |

Defendant Tessler is a citizen of Wyoming.

19.     Defendant Raymond Zimmerman ("Zimmerman") is an L Brands director and has been since 1984. Defendant Zimmerman is a member of L Brands' Audit Committee and has been since at least April 2018. Defendant Zimmerman knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations. L Brands paid defendant Zimmerman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2018 | $134,400 | $134,422 | $268,822 |

Defendant Zimmerman is a citizen of Florida.

20.    Defendant A. Wexner is an L Brands director and has been since May 1997. Defendant A. Wexner is the wife of defendant L. Wexner.  Defendant A. Wexner knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations.  L Brands paid defendant A. Wexner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $141,900 | $131,939 | $273,839 |

Defendant A. Wexner is a citizen of Ohio.

21.    Defendant Donna A. James ("James") is an L Brands director and has been since 2003.  Defendant James is the Chair of L Brands' Audit Committee and has been since at least April 2018.    Defendant James knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations.  L Brands paid defendant James the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $164,400 | $144,435 | $308,835 |

Defendant James is a citizen of Ohio.

22.    Defendant E. Gordon Gee ("Gee") is an L Brands director and has been since September 2012. Defendant Gee knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's:

(i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations. L Brands paid defendant Gee the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $134,400 | $134,422 | $268,822 |

Defendant Gee is a citizen of West Virginia.

23.     Defendant Michael G. Morris ("Morris") is an L Brands director and has been since September 2012. Defendant Morris knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations. L Brands paid defendant Morris the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $124,400 | $124,410 | $248,810 |

Defendant Morris is a citizen of Michigan.

24.     Defendant Stephen D. Steinour ("Steinour") is an L Brands director and has been since February 2014. Defendant Steinour knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations. L Brands paid defendant Steinour the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $111,900 | $111,913 | $223,813 |

Defendant Steinour is a citizen of Ohio.

25.    Defendant Patricia S. Bellinger ("Bellinger") is an L Brands director and has been since August 2017.  Defendant Bellinger knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations.  L Brands paid defendant Bellinger the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $119,125 | $111,913 | $231,038 |

Defendant Bellinger is a citizen of Massachusetts.

26.    Defendant Robert H. Schottenstein ("Schottenstein") is an L Brands director and has been since August 2017.  Defendant Schottenstein was also a member of L Brands' Audit Committee in at least April 2019.  Defendant Schottenstein knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations.  L Brands paid defendant Schottenstein the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $120,932 | $111,913 | $232,845 |

Defendant Schottenstein is a citizen of Ohio.

27.    Defendant David T. Kollat ("Kollat") was an L Brands director from 1976 to May 2019.  Defendant Kollat was also a member of L Brands' Audit Committee from at least April 2018 to at least April 2019.  Defendant Kollat knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and

substantial risk that it would need to reduce its dividend to pay down debt and finance operations. L Brands paid defendant Kollat the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $171,900 | $156,931 | $328,831 |

Defendant Kollat is a citizen of Florida.

28. Defendant Dennis S. Hersch ("Hersch") was an L Brands director from July 2006 to May 2019. Defendant Hersch knowingly or recklessly made improper statements in the Company's press releases, public filings, and public communications concerning the Company's: (i) declining key business segments; and (ii) increased and substantial risk that it would need to reduce its dividend to pay down debt and finance operations. L Brands paid defendant Hersch the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $121,900 | $121,926 | $243,826 |

Defendant Hersch is a citizen of New York.

29. The defendants identified in ¶¶16-17 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶16, 18-28 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18-19, 21, 26-27 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶16-28 are referred to herein as the "Individual Defendants."

## <u>DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

**Fiduciary Duties**

30. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe L Brands and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control

and manage L Brands in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of L Brands and not in furtherance of their personal interest or benefit.

31. To discharge their duties, the officers and directors of L Brands were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of L Brands were required to, among other things:

(a) properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(c) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d) remain informed as to how L Brands conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

32.     L Brands holds its fiduciaries to specific corporate governance principles beyond the requirements of law.  In particular, in the Company's Corporate Governance Principles, L Brands described the duties undertaken by the Board and the active oversight role the Board played in the Company's business affairs.  The Corporate Governance Principles state that "[t]he Board oversees the management of the Corporation pursuant to the applicable requirements of Delaware and Federal law, the rules and regulations of the Securities and Exchange Commission, and the listing requirements of the New York Stock Exchange."

33.     The Individual Defendants, as officers and directors of L Brands, were also bound by the Company's Code of Conduct (the "Code").  The Code set out basic principles to guide all directors, officers, and employees of L Brands, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.  With respect to the Company's commitment to ensure financial integrity and accurate records, the Code provides:

> We ensure that company records are accurate, timely, and fairly and completely reflect actual transactions and events. Our shareholders, customers, fellow associates, the public and government entities are entitled to accurate and truthful business records. We ensure that we are using company assets appropriately, and we are properly reflecting all expenditures, transactions, assets and liabilities in our financial records. It is each associate's responsibility to create accurate and complete records and follow internal controls. If you are unsure about what is required, talk to your manager.

**Additional Duties of the Audit Committee Defendants**

34.     In addition to these duties, under its Charter, the Audit Committee Defendants, defendants James, Nash, Tessler, and Zimmerman, owed specific duties to L Brands to assist the Board in overseeing the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements, among other things.  In particular, the Audit Committee Charter stated:

*Financial Statements, Disclosure and Certain Related Matters*

- The Audit Committee shall review and discuss with management, the internal auditors and the independent auditors (as may be required by the rules of the New York Stock Exchange and other applicable laws and regulations and, in addition, as the Audit Committee deems it appropriate):

  - the annual audited financial statements, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-K, and recommend to the Board whether the audited financial statement should be included in the Company's 10-K;

  - the quarterly financial statements, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-Q;

  - any analyses or other written communications prepared by management, the internal auditors and/or the independent auditors setting forth significant financial reporting issues, estimates, judgments and methodologies relating to the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

  - the critical accounting policies and practices of the Company;

                          *    *    *

  - The Audit Committee shall, in conjunction with the CEO and CFO of the Company, review the Company's internal controls and disclosure controls and procedures, including whether there are any significant deficiencies in the design or operation of such controls and procedures, material weaknesses in such controls and procedures, any corrective actions taken with regard to such deficiencies and weaknesses and any fraud involving management or other employees with a significant role in such controls and procedures.

                          *    *    *

*Other Risk Management Matters*

- The Audit Committee shall review the Company's policies and practices with respect to risk assessment and risk management, including discussing with management the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures.

- 14 -

**Breaches of Duties**

35.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of L Brands, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

36.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements to the public, improper practices that wasted the Company's assets, and caused L Brands to incur substantial damage.

37.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of L Brands, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, L Brands has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of L Brands, regarding the Individual Defendants' management of L Brands' operations and the Company's ability to sustain its dividend; and (ii) enhance the Individual Defendants' executive and directorial positions at L Brands and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

44.     L Brands is a fashion retailer company founded by defendant L. Wexner in 1963. The Company operates in three segments: (i) Victoria's Secret; (ii) Bath & Body Works; and (iii) Victoria's Secret and Bath & Body Works International.  In 2018, its portfolio of brands included Victoria's Secret, PINK, Bath & Body Works, La Senzi and Henri Bendel.  Victoria's Secret and PINK are brands primarily associated with women's intimate apparel and other apparel with fashion-inspired collections and fragrances.

45.     In 2018, Victoria's Secret was L Brands' key business segment, accounting for more than one-half of the Company's total revenue.  The segment sold products under the Victoria's Secret and PINK brand names online and at more than 1,200 company-owned stores in the United States, Canada, U.K., Ireland, and China.  Additionally, Victoria's Secret and PINK have more than 430 stores in more than 70 countries operating under franchise, license, and wholesale arrangements.

**The Company's Historically Large Dividend Supported Its Stock Price**

46.     L Brands had a long history of issuing and often increasing dividend payments to investors.  Indeed, the Company touted in November 2018 that it issued a dividend for 176 consecutive quarters.  In particular, between 2012 and 2018, the Company paid the following regular dividend:

| Year | Annual Dividend (Per Share) | Total Dividend (in $ Millions) |
|------|------------------------------|--------------------------------|
| 2012 | $1.00 | $290 |
| 2013 | $1.20 | $349 |
| 2014 | $1.36 | $399 |
| 2015 | $2.00 | $583 |
| 2016 | $2.40 | $686 |
| 2017 | $2.40 | $666 |

47.     As defendant Burgdoerfer stated, the "dividend is a very important source of return for many shareholders, we believe."  The safety of the dividend, as represented by the Company, attracted investment into L Brands' common stock.  Since the Company's dividend provided an ongoing stream of income to investors, it supported and helped limit any downside of the Company's stock price.

48.     Notably, the Board set the Company's dividend, as described in its annual and quarterly SEC filings.  In particular, the public filings stated:

**Dividend Policy and Procedures**

Our Board of Directors will determine future dividends after giving consideration to our levels of profit and cash flow, capital requirements, current and forecasted liquidity, the restrictions placed upon us by our borrowing arrangements as well as financial and other conditions existing at the time.  We use cash flow generated from operating activities to fund our ordinary dividends and a combination of cash flow generated from operating activities and financing activities to fund our special dividends.

**Defendant L. Wexner Exercises Control Over the Company and the Board**

49.     As Founder and CEO of L Brands, defendant L. Wexner exercises immense influence over the Company's business and operations.  Defendant L. Wexner's tenure as CEO spans more than five decades.  He is the longest-serving CEO of an S&P 500 company.  He is also the Company's largest principal stockholder, owning more than 17% of shares of L Brands common stock.  As L Brands' principal stockholder, defendant L. Wexner is the biggest beneficiary of the dividend, receiving approximately $197 million from the dividend in 2016,

approximately $111 million in 2017, and approximately $113 million in 2018. Given that defendant L. Wexner controls the Board, the Board did not act independently when setting the dividend. As described herein, each of the Individual Defendants had close affiliations with defendant L. Wexner.

50.     **Defendant A. Wexner** has been married to defendant L. Wexner since 1993. The two are concurrently involved with multiple organizations.

51.     Together, the Wexners are trustees of the Wexner Center for the Arts and the Wexner Medical Center Board at the Ohio State University ("OSU"). They have simultaneously served as Co-Chairs of the Leadership Council at the Harvard Kennedy School Center for Public Leadership since at least July 2015. The two have served on the Wexner Center Medical board as member and chairman, respectively, since January 2014. They have also served as members of The Columbus Partnership since 2003, and have been member (defendant A. Wexner) and Chairman (defendant L. Wexner), respectively, since at least May 2012.

52.     Defendants A. Wexner and L. Wexner together donated $25 million for the construction of the National Veterans Memorial and Museum developed by the Columbus Downtown Development Corporation ("CDDC"). Defendant A. Wexner has served as a board member of CDDC since October 2016.

53.     Further, defendant A. Wexner previously worked at the law firm Davis Polk & Wardwell LLP ("Davis Polk"). According to the *New York Times*, L Brands recently hired Davis Polk to conduct a "thorough review" of Jeffrey Epstein's (a convicted sex offender) involvement

- 19 -

with recruiting women to Victoria's Secret.[1]  The law firm has also contributed money to the OSU Wexner Center for the Arts.

54.     **Defendant Gee** has a long-standing personal relationship with defendant L. Wexner.  For example, a March 30, 2018 article in *Columbus Monthly*, titled "Stealing a President: The Story Behind Gordon Gee's Return to Ohio State," described the two as "close friend[s]."  The article detailed how defendant L. Wexner persuaded defendant Gee to accept an offer to become President of OSU.  It described repeated personal visits between the two friends, and their close ties to the university.

55.     Defendants L. Wexner and Gee concurrently served on the OSU board of trustees as Chairman and member, respectively, from 1996 to 1997 and from 2009 to 2012.  Defendant Gee also served as President of OSU from 2009 to 2012.  In 2012, the university medical center at OSU was renamed to the Wexner Medical Center, after defendant L. Wexner.  The Wexners have concurrently served on the board of Wexner Medical Center from January 2014 to the present.  Defendant Gee made the following comments about defendant L. Wexner in an OSU press release announcing the renaming of the OSU Medical Center, dated February 15, 2011:

> Les has truly lived the American dream…. He came from humble origins, with immigrant parents who worked hard every day of their lives.  And he went on to succeed beyond anyone's imagination.  He has done so much for this community, for this University, for us all.  He is a great example of what can be achieved through hard work, determination, and a generous spirit.  ***I am proud to call him my friend.***

---

[1] Defendant L. Wexner and Mr. Epstein had a close personal relationship.  Defendant L. Wexner "gave [Mr. Epstein] carte blanche to manage his billions, elevating Mr. Epstein's stature and affording him an opulent lifestyle."

56.    Defendants L. Wexner and Gee have also concurrently served as members of the American Academy of Arts and Sciences since 2013.

57.    **Defendant Steinour** is Vice Chair of CDDC and has been since January 2011. As stated above, the Wexners donated $25 million for the construction of the Veterans Memorial developed by CDDC.  Defendants Steinour and L. Wexner have concurrently served at CDDC as Vice Chair and board member, respectively, since at least October 2016.  They have also concurrently served on the Wexner Medical Center Board as a member and Chairman, respectively, since November 2013.

58.    **Defendant Schottenstein** has served as manager of the board of directors for non-profit organization Pelotonia since April 2014.  L Brands Foundation (founded by defendant L. Wexner) has been a major funding partner of Pelotonia since April 2014.  In addition, defendants Schottenstein and L. Wexner concurrently served on the OSU board of trustees as a member and Chairman, respectively, from December 2005 to June 2012.  They have also concurrently served on the Wexner Medical Center board as a member and Chairman, respectively, since December 2013.

59.    **Defendant Bellinger** and defendant L. Wexner concurrently served at the Harvard Kennedy School as adjunct lecturer and senior fellow, and Co-Chair of the Leadership Council at the Center for Public Leadership, respectively, from September 2017 to May 2018. They also concurrently served at the Center for Public Leadership as Executive Director, and Co-Chair of the Leadership Council, respectively, from August 2013 to January 2017.  Defendants Bellinger and A. Wexner concurrently served at the Harvard Kennedy School as adjunct lecturer and senior fellow, and Co-Chair of the Leadership Council at the Center for Public Leadership, respectively, from September 2017 to May 2018.   Defendants Bellinger and A. Wexner

concurrently served at the Center for Public Leadership as Executive Director, and a member of the Leadership Council, respectively, from at least February 2016 to January 2017.

60.     **Defendant Tessler** and defendant L. Wexner have concurrently served on the Leadership Council at the Center for Public Leadership as member and Co-Chair, respectively, since at least February 2016.  Furthermore, defendants Tessler and A. Wexner have concurrently served at Harvard Kennedy School as member of the Leadership Council at the Center for Public Leadership, and adjunct lecturer and senior fellow, respectively, from September 2017 to May 2018.

61.     **Defendant James** has served on the board of trustees for the Wexner Center for the Arts (named after defendant L. Wexner for his "significant founding gift" during its early planning stages).  Defendants L. Wexner and A. Wexner are trustees of the Wexner Center for the Arts.  Defendant James is also the Co-Founder of The Center for Healthy Families, whose key partner is The Center for Healthy Families—a non-profit entity founded by defendant A. Wexner.

62.     **Defendant Morris** has served as Chair of CDDC since February 2011, and as a board member since at least January 2008.

63.     **Defendant Hersch** and defendant L. Wexner concurrently served as Secretary and President of the Wexner Family Charitable Fund, respectively, from at least 2007 to at least 2012, and as director and President of the Wexner Family Charitable Fund, respectively, from at least 2013 to at least 2017.  Defendant Hersch is a President of N.A. Property, Inc., through which he has acted as a business advisor to defendants L. Wexner and A. Wexner since February 2008.  He has also served as Lead Director of PJT Partners since 2015, which has served as a financial advisor to L Brands since November 2018.

64.     Defendants Hersch and A. Wexner concurrently served at Davis Polk as a partner and attorney, respectively, from 1987 to 1992.  As stated above, Davis Polk has worked for L Brands for years, including being hired recently to conduct a review of Mr. Epstein's involvement with the Company.  In addition, defendants A. Wexner and Hersch concurrently served as director and Secretary of the Wexner Family Charitable Fund, respectively, from at least 2007 to at least 2012, and also concurrently served on the Wexner Family Charitable Fund's board of directors from at least 2013 to at least 2017.

65.     **Defendant Kollat** served as a member of the Marketing Committee of The Columbus Foundation from at least 2016 to 2018.  The Columbus Foundation received a total of at least $1.5 million in donations from L Brands Foundation in 2003, 2016, and 2017.  The Columbus Foundation also received a total of at least $12.7 million in donations from the Wexner Family Charitable Fund from 2016 to 2017.

66.     Based on the foregoing, each of the above defendants have long-standing, personal relationships with defendant L. Wexner.  Given these relationships, they did not act independently when setting the dividend during the relevant time period, to the benefit of defendant L. Wexner—the Company's principal stockholder.

**The Company Faces Financial Turmoil**

67.     During the years leading up to 2018, the Company's Victoria's Secret and PINK business segments began to decline significantly, negatively impacting L Brands' financial condition.  In particular, in 2015, the Victoria's Secret and PINK business segments began experiencing a significant decline in financial performance due to increased competition.  Other lingerie brands (such as Aerie, ThirdLove, Savage X Fenty, and emerging direct-to-consumer intimate apparel brands) were becoming more and more popular with consumers.  As a result,

Victoria's Secret (L Brands' most financially significant business segment) suffered from significant customer base and market share losses. For example, one *Motley Fool* writer called Aerie (a leading lingerie and activewear competitor) the "anti-Victoria's Secret," citing Victoria's Secret struggles compared to Aerie's growing success.[2] In fact, from 2015 through 2018, comparable store sales[3] at Victoria's Secret (including PINK) were roughly flat to down compared to the skyrocketing sales at Aerie.



68. Facing rising competition, L Brands announced in 2016 a strategic decision to exit certain Victoria's Secret categories, including swim and apparel, to focus "resources on core merchandise categories." L Brands also eliminated the Victoria's Secret catalog, which had an annual circulation to nearly 250 million households, resulting in the loss of a material amount of

---

[2] Leo Sun, *How American Eagle Outfitters Survived the Retail Apocalypse*, The Motley Fool, June 6, 2019, https://www.fool.com/investing/2019/06/06/how-american-eagle-outfitters-survived-the-retail.aspx (last visited Feb. 7, 2020).

[3] Comparable store sales is a financial metric commonly used by retailers to evaluate the performance of existing stores by measuring the difference in revenue generated at a particular location during a given period compared to an identical period in the past (usually the prior year). Comparable store sales trends is a "strong predictor of the health of retail operations and future success of a company," according to the Corporate Finance Institute.

business. In response, several analysts estimated that these decisions would result in reduced comparable sales growth for Victoria's Secret in the near term. Indeed, some analysts later estimated that the decisions resulted in the loss of more than $400 million in annual sales.

69. In an attempt to retain market share and drive sales, Victoria's Secret and PINK engaged in heavy promotional activity by offering consumers large discounts and even giving away items free of charge. Although this marketing strategy may have helped to mitigate sales declines, it adversely impacted the Company's profit margins and cash flows. For example, as the Company's total selling square feet—the measure of square feet in a brick-and-mortar retail store—increased from 6.9 million to 7.2 million between 2015 and 2017, its sales per average selling square foot declined significantly, falling from $864 to $784 during the same period.

70. As a result of the growth in competition and the strategic decisions to exit Victoria's Secret swimwear categories, eliminate the catalog, and offer heavy promotions, L Brands' revenue and income growth rates began to plummet. Specifically, the Company's revenue growth fell from 6.1% to 3.5% between 2015 and 2016, and from 3.5% to 0.5% between 2016 and 2017. The Company's adjusted operating income growth fell from 12% to -7% between 2015 and 2016, and from -7% to -15% between 2016 and 2017. Finally, its adjusted net income growth fell from 14% to -8% between 2015 and 2016, and from -8% to -16% between 2016 and 2017.

71. The cumulative effect of increasing competition, failing strategic decisions, and costs of increasing promotion also led to a material decline in L Brands' profitability and operating cash flow. For example, operating income between 2015 and 2017 fell from $2.192 billion to $1.728 billion. Pre-tax income fell from $1.934 billion to $1.312 billion. Finally, operating cash flow fell from $2.027 billion to $1.406 billion during the same period.

72.     As a result, L Brands' stockholders' deficit (its negative book value) nearly tripled, from $259 million on January 30, 2016 to $753 million on February 3, 2018.  Further, L Brands' working capital declined by nearly half, from $2.28 billion on January 30, 2016 to $1.26 billion on February 3, 2018.

73.     Several analysts repeatedly underscored how the financial distress within the Victoria's Secret business segment adversely impacted the Company's overall financial performance.  In early 2018, securities analysts noted that Victoria's Secret continued to generate negative comparable store sales and significantly lower margins during the crucial 2017 holiday season.  These results were disconcerting compared with a stronger holiday season experienced by the industry overall.  Analysts also observed that intensifying competition, increasing industry pricing pressure, declining merchandising margins, market share losses, and weak comparable store sales continued to plague the Company.

### THE BOARD INCREASES THE DIVIDEND DESPITE THE COMPANY EXPERIENCING CONTINUING AND SUBSTANTIAL LOSSES

74.     Despite the Company's mounting financial problems and growing debt, the Board chose to maintain and even increase L Brands' dividend.  In 2016, 2017, and 2018, L Brands' dividend payout[4] ratio was 60%, 70%, and 103%, respectively.  During those same years, L Brands' dividend yield was approximately 8%, 5%, and 8%, respectively.

75.     By either measure, L Brands' dividend was extremely high compared to other companies in the same sector.  For example, the median dividend payout ratio in 2018 for

---

[4] The dividend payout ratio is defined as dividends paid divided by net income.  The dividend yield is the amount of money a company pays stockholders for owning a share of its stock, divided by its current stock price (often expressed as a percentage).

publicly traded U.S. companies in the retail (special lines) sector was 40.02%.[5] The median dividend yield in 2018 for publicly traded U.S. companies in the retail (special lines) sector was 1.99%.[6] Thus, L Brands had one of the highest dividend payout ratios and dividend yields, over double and quadruple the median, respectively, of any publicly traded U.S. company in its sector in 2018.

76. Notably, defendant L. Wexner has recently been in talks to step down as CEO of L Brands after 57 years at the helm, according to an article by the *Wall Street Journal*. Facing retirement, defendant L. Wexner has sought to maximize the personal value of his stock in a short amount of time. To do so, he continued to issue the annual dividend in recent years, despite the Company having to borrow money to pay the dividend, and despite the negative impact this would have on the Company long-term. Because defendant L. Wexner exercises effective control over the Board, the Board went along with the plan.

77. After the payment of the ordinary dividends, the Company's cash flow declined by more than *50%*, from $1.44 billion in 2015 to only $720 million in 2017. L Brands was therefore left with limited financial ability to fund its ongoing operations, finance its capital expenditure requirements, and manage its multi-billion dollar debt level. As of February 3, 2018, L Brands' credit ratings were junk bond grade, presenting a higher risk of default or other adverse credit events to investors.

---

[5] Aswath Damodaran, *Dividend Fundamentals By Sector (US)*, NYU Stern School of Business, http://pages.stern.nyu.edu/~adamodar/New_Home_Page/dataarchived.html (last visited Feb. 7, 2020).
[6] *Id.*

78.     Moreover, between 2016 and 2018, L Brands had one of the highest debt-to-EBITDA ratios of any U.S. retailer.[7]  In 2016, 2017, and 2018, L Brands' debt-to-EBITDA ratio was 2.16, 2.52, and 2.88, respectively.   These ratios were alarmingly high compared to competitor American Eagle Outfitters (Aerie)—which were 1.20, 1.13, and 1.15 in 2016, 2017, and 2018, respectively.  As one Jeffries analyst report stated, L Brands "has one of the highest net leverage ratios in retail (even before counting for leases)[.]"

79.     Thus, by several common measures, the dividend was placing a financial strain on the Company.  Its key business, Victoria's Secret, had been deteriorating rapidly with little expectation of reversal.  As a result, there was a substantial risk the dividend would need to be reduced, particularly because L Brands needed to reduce its high debt level in order to maintain or improve its credit rating.

80.     As the Company admitted, its ability to pay dividends "will depend on our ability to generate sufficient cash flows from operations in the future."  Nevertheless, the Individual Defendants trivialized the risk that it would need to cut its dividend, misleadingly representing that the dividend was safe for the foreseeable future.

## THE IMPROPER STATEMENTS REGARDING THE COMPANY'S ABILITY TO SUSTAIN ITS DIVIDEND

81.     The Individual Defendants are responsible for a series of improper statements regarding L Brands' financials, financial prospects, and disclosure controls.  Between May 31, 2018 and November 19, 2018, the Individual Defendants made false or misleading statements

---

[7] EBITDA (earnings before interest tax depreciation amortization) is often considered a proxy for the cash flow derived from a company's operations.  It can be useful when comparing to companies because it excludes the impact of a company's capital expenditures and non-cash items such as depreciation and amortization.  A company's debt-to-EBITDA ratio is often used to evaluate its financial stability.

and failed to disclose that: (i) Victoria's Secret and PINK were having a material adverse effect on L Brands' cash flow, liquidity and debt levels; (ii) the declining performance of Victoria's Secret and PINK increased the likelihood that the Company would need to reduce its dividend; and (iii) consequently, the Company would not be able to sustain its dividend.

82.     On May 31, 2018, defendant Burgdoerfer presented at the RBC Capital Markets Consumer and Retail Conference.  During the conference, he described the payment of the dividend as "very safe" and reassured investors about the sustainability of the Company's dividend.  Defendant Burgdoerfer claimed that: (i) L Brands had the "cash flow needed and cash balances, *et cetera*, to sustain the dividend"; (ii) "the dividend is important to shareholders and that we're able to, with the current year cash flow, sustain our dividend"; and (iii) "[t]he [C]ompany, in its history, has never reduced the dividend."  In particular, the following exchange took place between defendant Burgdoerfer and an analyst attending the conference:

**Brian Jay Tunick** – *RBC Capital Markets, LLC, Research Division – MD and Analyst*

I guess there's a lot of dividend and yield investors in the room, and we've been getting a lot of calls on the 7% dividend yield.  Can you maybe talk about, when you reduced your cash flow and you reduced your CapEx guidance for the year, how important is the dividend?  And how do you guys think about capital allocation?

**Stuart B. Burgdoerfer** – *L. Brands, Inc. – Executive VP and CFO*

Well, we think that -- thanks for the question, Brian.  ***We think that dividend is very important.***  So we have returned capital through regular dividends.  ***The company, in its history, has never reduced the dividend.  We believe that a large number of shareholders place high value on the dividend.***  That's implicit to the question you're asking.  ***We have the cash flow needed and cash balances, et cetera, to sustain the dividend.***  It is a very high payout ratio right now, I realize that, and a very high yield.  ***But again, we believe that the dividend is important to shareholders and that we're able to, with current year cash flow, sustain our dividend.***  Certainly, we get questions from other investors and have debate as we should about the magnitude of our share repurchase program.  We are buying back some stock.  You are aware we authorized a program, and we update every quarter about the activity there.  But one could say that, that's a modes program in

- 29 -

relation to the capitalization of the company, but we think a balanced approach makes sense.

We do believe there is a long record of companies that thought that they knew for sure it was a good buy, and time proved them wrong. We do believe that the value of the company is substantially greater than where it's trading at today, but we have to prove it. The company would seem -- has really -- and folks have written about this. The only thing that management really focuses on is performance. When you look at valuation, I mean, it's at the very low end of a lot of ranges. *So back to the dividend, the dividend is very safe.*

83. On June 6, 2018, defendant Burgdoerfer presented at the Robert W. Baird Global Consumer, Technology and Services Conference. During the conference, he again reassured investors that the Company's dividend was sustainable. In particular, he stated:

*The dividend is a very important source of return for many shareholders*, we believe. *Our ability to maintain the dividend*, even in this time period where the payout ratio is very high and yield is very high, *we're confident that we can maintain the dividend. As you've looked at our cash flow results, the free cash flow of the business is sufficient to pay the dividend.* And we've been carrying excess cash as a business *beyond what's needed for the day-to-day working capital needs and financing needs of the business. So we're comfortable with our cash position, our liquidity position, our capital structure. And we're comfortable with the current dividend level in the business.* And we believe we're in an operating period where we're going to turn this business, and specifically the lingerie and PINK businesses within Victoria's. And those relationships would normalize to more typical levels that we've seen historically and that you'd see in most major companies on a broad basis, but *we're very comfortable with the dividend.*

84. Also during the June 6, 2018 conference, defendant Burgdoerfer minimized the threat that competition posed to Victoria Secret's business in response to a question from an analyst. In particular, he stated:

**Mark R. Altschwager** – *Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst*

Digging into Victoria's Secret a bit. On the Q1 call, management acknowledged that the recovery at VS is taking a bit longer than anticipated. How much of this is related to some of the internal disruptions or in terms of the changes that you've made versus some intensifying competitive pressures?

**Stuart B. Burgdoerfer** – *L Brands, Inc. – Executive VP & CFO*

It's a very hard question to answer. I understand the spirit of the question, and I'll do my -- I think most of the majority of the result we're seeing at Victoria's Secret is a function of our own execution, changes we've made and challenges or opportunities that we have in our own execution. Are there more competitors out there? There are. When you look at the size and significance of those competitors and really do the math on it, they're not that large at this time. And not suggesting from that, that we should be arrogant about competition or not pay attention to competition. We do, but I would have a view -- we have a view that most of our opportunity in performance is through executing our game plan more effectively. And due to the near-term impact, which has sustained longer than we expected, there are a lot of changes that we made in the spring of 2016: the category exits, the change in promotion, the reorganization of the business, reduction in headcount, elimination of the catalog. The combination of all those things, intended to focus the business on core categories and ultimately accelerate growth in the near term, had put a lot of pressure on the business.

85. On June 7, 2018, L Brands filed its Quarterly Report on Form 10-Q with the SEC for the period ended May 5, 2018 (the "Q1 2018 Form 10-Q"). The Q1 2018 Form 10-Q represented that the Company's "disclosure controls and procedures were effective and designed to ensure that information required to be disclosed by [L Brands.]" In particular, the Q1 2018 Form 10-Q stated:

*Evaluation of disclosure controls and procedures.* As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective and designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

*Changes in internal control over financial reporting.* The adoption of ASC 606, *Revenue from Contracts with Customers*, required the implementation of new controls and the modification of certain accounting processes related to revenue recognition. There were no other changes in our internal control over financial

reporting that occurred in the first quarter 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

86.     The Q1 2018 Form 10-Q was signed and certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Burgdoerfer and L. Wexner.  Defendants' Burgdoerfer and L. Wexner certifications acknowledged their responsibility "for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting ... for [L Brands]," and incorrectly stated that they had:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

87.     The Q1 2018 Form 10-Q contained a "Dividend Policy and Procedures" section that discussed the Company's dividend, but failed to disclose that the Company's dividend was not sustainable.  In particular, the Q1 2018 Form 10-Q stated:

**Dividend Policy and Procedures**

Our Board of Directors will determine future dividends after giving consideration to our levels of profit and cash flow, capital requirements, current and forecasted liquidity, the restriction placed upon us by our borrowing arrangements as well as financial and other conditions existing at the time. We use cash flow generated from operating activities to fund our ordinary dividends and a combination of cash flow generated from operating activities to fund our special dividends.

Under the authority and declaration of our Board of Directors, we paid the following dividends during the first quarter of 2018 and 2017:

| | Ordinary Dividends (per share) | Total Paid (in millions) |
|---|---|---|
| **2018** | | |
| First Quarter | $ 0.60 | $ 168 |
| **2017** | | |
| First Quarter | $ 0.60 | $ 172 |

88. On August 22, 2018, the Company issued a press release announcing its financial and operational results for the second quarter 2018 (the period ended August 4, 2018), which again failed to disclose that the Company's dividend was not sustainable due to Victoria's Secret and PINK's struggles. In the press release, the Company reported earnings of $0.36 per share compared to $0.48 per share for the same quarter the prior year, and operating income of $228.1 million compared to $300.9 million the prior year. The Company also reduced its guidance for 2018 full-year earnings per share from $2.70-$3 per share to $2.45-$2.70 per share, and issued guidance for third quarter earnings per share of between $0 and $0.05. In addition, the August 22, 2018 press release revealed that Victoria's Secret's comparable sales during the 2018 second quarter continued to decline, from the already depressed 2017 second quarter level, on a year-over-year basis.

89. On August 23, 2018, L Brands held a conference call with investors and analysts to discuss the operations and earnings release. During the conference call, one analyst questioned management about the dividend given the disappointing operating results. Defendant Burgdoerfer again reassured investors about the sustainability of the Company's dividend, noting

that much of L Brands' earnings and cash flow are generated during the fourth quarter of the year and that because "we have more insight into holiday results, we're comfortable with the dividend today, [and] have the free cash flow to support it." In particular, the following exchange took place:

> **Michael Charles Binetti** - *Crédit Suisse AG, Research Division - Research Analyst*
>
> \* \* \*
>
> You guys have remained very committed to a very, very high dividend yield despite, I think, the operating results coming in below some of your hopes for a bit here. I know you've worked hard to moderate CapEx down a few times here along the way. But could you help us with how you think about holding steady the approach to the capital deployment in contrast to the variances you've seen in the operating plans?
>
> **Stuart B. Burgdoerfer** - *L Brands, Inc. - Executive VP & CFO*
>
> Important subject, obviously, important source of return for shareholders. Obviously, the payout ratio is abnormally high. The yield is very high. We look at it regularly. Management does. We have the appropriate conversations with our board. Obviously, a lot of our earnings and our cash come in the fourth quarter. We have conversations about this regularly. But importantly, as we have more insight into holiday results, we're comfortable with the dividend today, have the free cash flow to support it. But it's obviously something that should be looked at periodically, and we do. We're comfortable with it. We expect to -- one way to deal with the payout ratio is obviously to increase earnings. That's what we're focused on. Earnings increases would drive obviously an increase in the share price and get dividend yields and relationships like that in a more normal range. But with that said, our operating performance has lagged our expectations over the last several years. So we look at it periodically in a rigorous way. That will continue. We're comfortable with it based on what we know at this point, and we'll continue to look at it. Thank you.

90.     On September 7, 2018, L Brands filed its Quarterly Report on Form 10-Q with the SEC for the period ended August 4, 2018 (the "Q2 2018 Form 10-Q"). The Q2 2018 Form 10-Q was signed and certified as accurate pursuant to SOX by defendants Burgdoerfer and L. Wexner. The Q2 2018 Form 10-Q contained the same control disclosures as the Q1 2018 Form 10-Q. It also contained a "Dividend Policy and Procedures" section that discussed the Company's

- 34 -

dividend, but failed to disclose that the Company's dividend was not sustainable. In particular, the Q2 2018 Form 10-Q stated:

**Dividend Policy and Procedures**

Our Board of Directors will determine future dividends after giving consideration to our levels of profit and cash flow, capital requirements, current and forecasted liquidity, the restrictions placed upon us by our borrowing arrangements as well as financial and other conditions existing at the time. We use cash flow generated from operating activities to fund our ordinary dividends and a combination of cash flow generated from operating activities and financing activities to fund our special dividends.

Under the authority and declaration of our Board of Directors, we paid the following dividends during year-to-date 2018 and 2017:

|  | Ordinary Dividends (per share) | | Total Paid (in millions) | |
|---|---|---|---|---|
| **2018** | | | | |
| Second Quarter | $ | 0.60 | $ | 167 |
| First Quarter | $ | 0.60 | $ | 168 |
| **2018 Total** | $ | 1.20 | $ | 335 |
| **2017** | | | | |
| Second Quarter | $ | 0.60 | $ | 172 |
| First Quarter | $ | 0.60 | $ | 172 |
| **2017 Total** | $ | 1.20 | $ | 344 |

91. The Q2 2018 Form 10-Q also contained a "Credit Ratings" section that discussed the weakening of the Company's credit rating, but failed to disclose that the worsening condition of the Company's credit rating increased the risk that the Company's dividend amount was not sustainable. In particular, the Q2 2018 Form 10-Q stated:

**Credit Ratings**

Our borrowing costs under our Revolving Facility and Secured Foreign Facilities are linked to our credit ratings. If we receive an upgrade or downgrade to our corporate credit ratings, the borrowing costs could decrease or increase, respectively. The guarantees of our obligations under the Revolving Facility and Secured Foreign Facilities by the Guarantors and the security interests granted in our and the Guarantors' collateral securing such obligations are released if our credit ratings are higher than a certain level. Additionally, the restrictions imposed

- 35 -

under the Revolving Facility and Secured Foreign Facilities on our ability to make investments and to make restricted payments cease to apply if our credit ratings are higher than certain levels. Credit rating downgrades by any of the agencies do not accelerate the repayment of any of our debt.

*     *     *

Subsequent to August 4, 2018, S&P downgraded our Corporate rating to BB, our Senior Unsecured Debt with Subsidiary Guarantee rating to BB and our Senior Unsecured Debt rating to B+, and also updated our Outlook to Negative. Additionally, for commercial reasons, Fitch withdrew our ratings on August 29, 2018. In conjunction with the withdrawal, Fitch issued final ratings that downgraded our Corporate rating to BB, our Senior Unsecured Debt with Subsidiary Guarantee rating to BB and our Senior Unsecured Debt rating to BB-.

92. On September 13, 2018, L Brands issued a press release announcing it was closing all Henri Bendel stores and the Henri Bendel e-commerce website in January 2019. Defendant L. Wexner stated L Brands took such action "to improve [C]ompany profitability and focus on our larger brands that have greater growth potential." In particular, the press release stated:

"We are committed to improving performance in the business and increasing shareholder value. As part of that effort, we have decided to stop operating Bendel to improve company profitability and focus on our larger brands that have greater growth potential," said Leslie Wexner, chairman and CEO of L Brands. "This decision is right for the future growth of our company, but not easy because of the impact to our L Brands family. I want to thank our Bendel associates for their dedication to this iconic brand and to our loyal Bendel customers."

93. On November 8, 2018, L Brands issued a press release stating that it expected to report losses per share of approximately $0.17 during the 2018 third quarter. The expected losses per share included a pretax cash charge of $20 million related to the closure of the Company's Henri Bendel business and an approximate pretax non-cash impairment charge of $80 million related to certain Victoria's Secret store assets. The press release also announced the declaration of the Company's regular quarterly dividend $0.60 per share, which the Company characterized as "the company's 176th consecutive quarterly dividend."

## THE TRUTH EMERGES

94.     The truth behind the Company's financial prospects and the Individual Defendants' wrongdoing began to emerge on November 19, 2018, when the Company announced its financial results for the third quarter of 2018.  The press release announced that L Brands intended to reduce its annual ordinary dividend *by half*, from $2.40 to $1.20, beginning with the quarterly dividend to be paid in March 2019 in order to deleverage the Company's balance sheet.  In particular, the press release stated:

### Dividend

After extensive review, the Board of Directors plans to reduce the company's annual ordinary dividend to $1.20 from $2.40 currently, beginning with the quarterly dividend to be paid in March 2019. The planned reduction will result in a dividend payout ratio that is more consistent with the company's past practice, and a dividend yield in line with relevant comparisons. The approximately $325 million in cash made available from the dividend reduction will be utilized primarily to contribute to the deleveraging of the company's balance sheet over time. The Board was assisted in its assessment by its financial advisors BridgePark Advisors and PJT Partners.

95.     The November 19, 2018 press release also announced a change in the leadership of Victoria's Secret Lingerie, including that Jan Singer had resigned from her position of CEO, with the number one priority of "improving performance."  In particular, the press release stated:

### Victoria's Secret Lingerie Leadership Change

The company also announced today that John Mehas has been named CEO of Victoria's Secret Lingerie, effective early 2019, replacing Jan Singer, who has resigned.

"John is an outstanding retail merchant and we could not be more excited for him to lead Victoria's Secret Lingerie to a new phase of success," said Wexner. "Our number one priority is improving performance at Victoria's Secret Lingerie and PINK.  In doing so, our new leaders are coming in with a fresh perspective and looking at *everything* … our marketing, brand positioning, internal talent, real estate portfolio and cost structure. *Most importantly*, we are focused on our merchandise assortment - it all starts with the customer saying 'I'll take it.' I am confident that, under John's leadership, Victoria's Secret Lingerie, the world's

leading lingerie brand, will continue to be a powerhouse and will deliver products and experiences that resonate with women around the globe."

(Alteration in original).

96.     On November 20, 2018, L Brands held a conference call with investors and analysts to discuss the third quarter 2018 earnings release.  During the conference call, defendant Burgdoerfer discussed the dividend reduction and L Brands' "commit[ment] to a full review of the business."  In particular, he stated:

> We made some important decisions in the quarter, including the decision to close the Henri Bendel business, pursuing alternatives for La Senza and reducing our dividend and committing to deleverage to enable us to increase our focus on our core businesses and strengthen our company in the long term.  Our #1 priority is improving performance at Victoria's Secret Lingerie and PINK.
>
> *     *     *
>
> We're committed to a full review of the business.  Everything is on the table, including our brand positioning, marketing, talent, real estate, cost structure and, most importantly, our merchandise assortments.  By executing against our strategy, focusing on the fundamentals, staying close to our customers and leveraging the strength of our brands, we will deliver on our commitments for our stakeholders, customers, associates and shareholders.

97.     In response to a question from an analyst about putting "everything[] on the table," defendant Burgdoerfer responded about the importance of "[t]he re-setting of the dividend to better match the operating results of the business in consultation and approved by the Board with outside advice[.]"  In particular, he stated:

> **Paul Lawrence Lejuez** - *Citigroup Inc, Research Division - MD and Senior Analyst*
>
> You mentioned everything's on the table.  I'm curious where you're putting your emphasis currently, spending your time.  How is Les spending his time?  And I'm also curious if all of this work is happening now on the Victoria's Secret side or if we have to wait until John gets there before we start to see maybe some changes.  And also curious just about the decision for Les to not be on the call today.
>
> **Stuart B. Burgdoerfer** - *L Brands, Inc. - Executive VP & CFO*

Sure. So Paul, in terms of just taking a fresh, hard look at everything, I mean, it starts with decisions that we've announced. So eliminating losses related to noncore businesses, Bendel and La Senza previously announced. But important and aggregating to about $85 million of annual operating income, a big decision in part of "everything." The re-setting of the dividend to better match the operating results of the business in consultation and approved by the Board with outside advice, also a very important decision. But most importantly, as shared in the remarks and circulated remarks and even already this morning, the most important thing that we can do and that we're focused on is addressing the opportunities in the Victoria's Secret Lingerie and PINK businesses. And first and foremost, again, consistent with our mindset over a long period of time, it does start with the merchandise. Leadership is critical. We've got new -- Amie rejoining or joining the PINK business recently and John coming. You're asking if we're looking at everything now or whether some of that will wait. Certainly, everything is on the table, but understandably, some of these things will take more time than others, and some of them, importantly, will be led by -- the evaluations will be led by Amie and John, respectively. So broad in scope. Timing will depend on the nature of the opportunity. Not all these things will happen overnight, as you can appreciate. But importantly, nothing is off the table, meaning we are fundamentally looking at and will look at everything.

98.    Defendant Burgdoerfer provided additional information about the dividend reduction during the conference call, stating that the "freed-up cash will be used principally to reduce debt in the near term." In particular, he stated:

**Brian Jay Tunick** - *RBC Capital Markets, LLC, Research Division - MD and Analyst*

I guess, Stuart, curious maybe if you can share with us a little maybe the Board's thinking about what John brings to the table. Obviously, Jan from Spanx and Nike, just maybe give us a sense of what John brings to the table, why he's the right guy now, given all these changes. And then secondly, maybe, Stuart, talk about the balance sheet and maybe whether a leverage ratio. But sort of like what are the contexts that you're looking at here, before maybe equity shareholders might get any of the free cash flow after the debt paydown?

*           *           *

**Stuart B. Burgdoerfer** - *L Brands, Inc. - Executive VP & CFO*

And with respect to balance sheet, we're not formulaic about it, Brian. But obviously, the ratios, whether it's the dividend payout ratio, the yield, the adjusted leverage ratios, have gone out of the historic ranges for us. And so the Board, again, with outside advice and very deliberately considered by the Board and approved by the Board, we made an important decision to reduce the dividend

- 39 -

from $2.40 annually to $1.20. In terms of the cash freed up -- and some of this will be dynamic, obviously, as operating results play out over the next few years, but deliberate discussion about what we'll do with that cash. And as indicated in our commentary, in the release and in our circulated commentary, that freed-up cash will be used principally to reduce debt in the near term. We're more comfortable with a leverage ratio in the mid-3s. Again, not formulaic about it, but it's risen meaningfully as the operating result in the business has declined and made an important decision to re-set those things over the next few years with the decision, beginning in March, to reduce the dividend. As to how and when some of that freed-up cash gets back to shareholders, obviously, our long history has been to return excess cash to shareholders, as you know, through a combination of regular dividends, special dividends and share repurchase activity but, at this time, felt it appropriate to make the adjustments we've made. Thanks.

99.     On this news, L Brands' market capitalization plunged more than 17%, or $6.12 per share, on November 20, 2018, to close at $28.43 per share compared to the previous trading day's closing of $34.55 per share, erasing almost $1.7 billion in market capitalization in a single day.

100.     Several analysts attributed the decline to the reduction of the Company's dividend. For example, one analyst from Barclays Equity Research wrote on November 21, 2018 that L Brands' "share price underperformance yesterday ... is an understandable reaction to reduced dividend support[.]" Another analyst from J.P. Morgan lowered its price target, and noted that the decision to cut the dividend "is somewhat surprising based on recent [management] commentary: (i) 8/23 – 'we are comfortable with the dividend' and have the 'free cash flow to support it', and (ii) [] reiterated the ability to maintain the dividend 'even in this time period where the payout ratio is very high and the yield is very high'[.]"

## REASONS THE STATEMENTS WERE IMPROPER

101.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

        (a)      Victoria's Secret and PINK were having a material adverse effect on L Brands' cash flow, liquidity and debt levels;

        (b)      the declining performance of Victoria's Secret and PINK increased the risk that the Company would need to reduce its dividend to pay down debt and finance operations; and

        (c)      as a result of the foregoing, the Company's representations concerning its business operations and financial prospects were improper.

## DAMAGES TO L BRANDS

102.    As a result of the Individual Defendants' improprieties, L Brands disseminated improper, public statements concerning the Company's ability to sustain its dividend. These improper statements have devastated L Brands' credibility as reflected by the Company's almost $4.5 billion, or 42.8%, market capitalization loss.

103.    L Brands' performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, L Brands' current and potential customers consider a company's ability to accurately value its business prospects and evaluate sales and growth potential. Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions. L Brands' ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

104.    Further, as a direct and proximate result of the Individual Defendants' actions, L Brands has expended, and will continue to expend, significant sums of money.    Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)    costs incurred from issuing dividend payments the Company could not afford; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to L Brands.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

105.    Plaintiff brings this action derivatively in the right and for the benefit of L Brands to redress injuries suffered, and to be suffered, by L Brands as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  L Brands is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

106.    Plaintiff will adequately and fairly represent the interests of L Brands in enforcing and prosecuting its rights.

107.    Plaintiff was a stockholder of L Brands at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current L Brands stockholder.

108.    The current Board of L Brands consists of the following twelve individuals: defendants L. Wexner, Tessler, Zimmerman, A. Wexner, James, Gee, Morris, Steinour, Bellinger, Schottenstein, and non-defendants Sarah E. Nash and Anne Sheehan.  Plaintiff has not

made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

109.    Defendants L. Wexner, Tessler, Zimmerman, A. Wexner, James, Gee, Morris, Steinour, Bellinger, and Schottenstein breached their fiduciary duties of loyalty by making improper statements in the Company's press releases, SEC filings, and oral communications regarding L Brands' financial, financial prospects, and disclosure controls.  Accordingly, these defendants (ten of the twelve Board members) face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

110.    Defendants James, Tessler, and Zimmerman as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

111.    Any suit by the current directors of L Brands to remedy these wrongs would expose defendants L. Wexner, Burgdoerfer, and L Brands to liability for violations of the federal securities laws in the pending consolidated securities class action, and would result in civil actions being filed against one or more of the other Individual Defendants.  The securities class action alleges violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendants L. Wexner and Burgdoerfer in this action, then L Brands' efforts would compromise its defense of the securities class action.  Accordingly, demand on the Board is excused.

**Demand Is Excused Because a Majority of the Board Cannot Conduct an Independent and Objective Investigation into the Wrongful Conduct**

112.    The Board's tangled web of close professional and personal relationships amount to conflicts of interest that have precluded, and will continue to preclude, it from taking necessary and proper steps to investigate and remedy L Brands' unlawful conduct.

113.    Two of the Company's Board members (defendants L. Wexner and A. Wexner) are not independent by definition and as admitted in L Brands' 2019 Proxy Statement on form DEF 14A filed with the SEC on April 23, 2019.

114.    **Defendant L. Wexner**: The principal professional occupation of defendant L. Wexner is his employment with L Brands, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  Defendant L. Wexner is the Chairman of the Board, the Founder of the Company, and the Company's principal stockholder.  Accordingly, defendant L. Wexner lacks independence from defendants Tessler, Zimmerman, A. Wexner, James, Gee, Morris, Steinour, Bellinger, and Schottenstein, and non-defendants Sarah E. Nash and Anne Sheehan due to his interest in maintaining his executive position at L Brands.  Furthermore, defendant L. Wexner is heavily involved with several

organizations that are tied to the Director Defendants.  For example, defendant L. Wexner has been on the leadership teams of the American Academy of Arts and Sciences, the Harvard Kennedy School Center for Public Leadership, the Columbus Partnership, the Ohio State University, the Ohio State University Wexner Medical Center, and the Wexner Family Charitable Fund.  These organizations, among others, have extensive overlap with the Director Defendants, as described herein.

115.    This lack of independence renders defendant L. Wexner incapable of impartially considering a demand to commence and vigorously prosecute this action.  Demand is futile as to defendant L. Wexner.

116.    **Defendant A. Wexner**: Defendant A. Wexner will not vote to initiate litigation against defendant L. Wexner.  She has been married to defendant L. Wexner since 1993.

117.    The two are concurrently involved with multiple organizations.  Together, the Wexners: (i) are trustees of the Wexner Center for the Arts; (ii) have simultaneously served as Co-Chairs of the Harvard Kennedy School Center for Public Leadership since at least July 2015; (iii)  have served on the Wexner Center Medical board as member and Chairman, respectively, since January 2014; and (iv) have served as members of The Columbus Partnership since 2003, and have been member (defendant A. Wexner) and Chairman (defendant L. Wexner) of The Columbus Partnership, respectively, since at least May 2012.  The Wexners have also run the Wexner Foundation since 1990, when defendant A. Wexner joined defendant L. Wexner as Co-Chairman.  They have also together donated $25 million for the construction of the National Veterans Memorial and Museum developed CDDC, of which defendant A. Wexner has served as a board member since October 2016.

118.    Further, defendant A. Wexner is heavily involved with several organizations tied to the Director Defendants.  For example, defendant A. Wexner has served on leadership teams for the L Brands Foundation, the Center for Health and Families, the CDDC, the Harvard Kennedy School Center for Public Leadership, KIPP Columbus ("KIPP"), Pelotonia, the Wexner Family Charitable Fund, the Columbus Partnership, the Columbus Foundation, the Ohio State University, the Ohio State University Foundation, and the Ohio State University Wexner Medical Center.

119.    Defendant A. Wexner's extensive entanglements with the Director Defendants include her service as the following:

- Chair and Trustee of the L Brands Foundation from 2001 to 2017.  Concurrent with her service as Chair and Trustee, L Brands Foundation donated to organizations affiliated with defendants James, Tessler, Schottenstein, and Gee during their tenures at their respective organizations.  The following chart provides further details about these entanglements:

| Donations made by the L Brands Foundation | | |
|---|---|---|
| **KIPP Columbus**<br>Defendant Abigail Wexner - Vice Chair (At least April 2007 - Present);<br>Defendant Burgdoerfer - Director (2010 - Present) | 2008 | $50,000 |
| | 2010 | $50,000 |
| | 2015 | $50,000 |
| | 2016 | $150,000 |
| | 2017 | $150,000 |
| **The Columbus Foundation**<br>Defendant Leslie Wexner - Member, Governing Committee (1988 - 1993); Vice-Chairman (1990 - 1993)<br>Defendant Abigail Wexner - Chair, Governing Committee (1994 - 2003) | 2003 | $110,000 |
| | 2016 | $699,430 |
| | 2017 | $726,112 |
| **I Know I Can**<br>Defendant Gee - Director (2009 - 2014)<br>Defendant James - Trustee (At least June 2002 - 2011) | 2009 | $5,000 |
| | 2010 | $5,000 |
| | 2011 | $12,000 |
| | 2012 | $15,000 |
| | 2014 | $20,000 |

| | | |
|---|---|---|
| **The Ohio State University Foundation**<br>Defendant Leslie Wexner - Founding Member, Chair (1985 - 1989)<br>Defendant Schottenstein - Board Member (At least May 2016 - Present) | 2016 | $5,094,329 |
| | 2017 | $5,527,339 |
| **Boys and Girls Club of America**[8]<br>Defendant Tessler - Member, Board of Governors (At least April 2012 - Present) | 2012 | $10,000 |
| | 2013 | $25,000 |
| | 2014 | $60,000 |
| | 2015 | $50,000 |
| | 2016 | $170,000 |
| | 2017 | $100,000 |
| **Women's Fund of Central Ohio**<br>Defendant James - Co-Chair (Prior to October 2010) | 2008 | $5,000 |
| | 2009 | $5,000 |
| | 2010 | $20,000 |
| **Columbus School for Girls**<br>Defendant Gee - Director (1990 - 1998; 2007 - 2014)<br>Defendant Schottenstein - Director (Unknown) | 2007 | $20,000 |
| | 2008 | $15,000 |
| | 2009 | $15,000 |
| | 2010 | $15,000 |
| | 2011 | $275,000 |
| | 2012 | $25,000 |
| | 2014 | $25,000 |
| **The Columbus Partnership**<br>Defendant Abigail Wexner - Board Member (2003 - Present)<br>Defendant Leslie Wexner - Founding Member (1997 - Present); Chairman (At least May 2012 - Present)<br>Defendant Gee - Member, Executive Board (2007 - 2013) | 2004 | $140,000 |
| | 2005 | $135,000 |
| | 2007 | $110,000 |
| | 2009 | $50,000 |
| | 2010 | $250,000 |
| | 2011 | $600,000 |
| | 2012 | $450,000 |
| | 2014 | $450,000 |
| | 2015 | $450,000 |
| | 2016 | $575,000 |
| | 2017 | $2,520,000 |

- Founder and President of the Center for Healthy Families ("CHF"), a non-profit organization based in Franklin County, Ohio. Defendant James is the Co-Founder of CHF and served as a member of its board of trustees from February 2010 to June 2019.

---

[8] Figures include donations to both Boys and Girls Club of America as well as Boys and Girls Club of Columbus.

- Board member of CDDC since October 2016, concurrently with defendants Steinour and Morris.

- Co-Chair, Leadership Council of the Harvard Kennedy School Center for Public Leadership since July 2015, concurrently with defendant Bellinger (as Executive Director) from August 2013 to January 2017, and with defendant Tessler (as Member) since February 2016. Harvard University received a total of at least $32.5 million in donations from the Wexner Family Charitable Fund from 2015 to 2017. Harvard University also received a total of $16.6 million in donations from the Wexner Foundation from at least 2001 to November 2017.

- Vice Chair of the board of directors of KIPP, a part of a national network of public schools, since April 2007. KIPP received donations from several organizations affiliated with defendant Gee from at least 2009 through 2017. KIPP also received a total of $450,000 in donations from L Brands Foundation from 2008 through 2017. KIPP received a $1 million donation from the Wexner Family Charitable Fund in 2017.

- Director of Pelotonia, a non-profit organization, since 1997. Pelotonia received a total of at least $300,000 in donations from the Wexner Family Charitable Fund from 2015 through 2017. Defendant A. Wexner and defendant Schottenstein have concurrently served as managers of the Pelotonia board of directors since April 2014. She and defendant Steinour have concurrently served as managers of the Pelotonia board of directors since January 2016. Defendant Steinour is a Partner at Huntington Bancorp, which has been a Pelotonia partner since March 2014.

- Treasurer of the Wexner Family Charitable Fund since 2001 and Director since 2007. Concurrent with defendant A. Wexner's service, the Wexner Family Charitable Fund donated to organizations affiliated with defendants James, Tessler, Schottenstein, and Gee during their tenures at their respective organizations.

- Member of The Columbus Partnership since 2003. Defendants A. Wexner and Gee concurrently served as members of The Columbus Partnership from 2007 to 2013. Defendants A. Wexner and L. Wexner have served as members of The Columbus Partnership since 2003.

- Chair of the Governing Committee of The Columbus Foundation from 1994 to 2003. The Columbus Foundation received a total of at least $1.5 million in donations from L Brands Foundation in 2003, 2016, and 2017. The Columbus Foundation also received a total of at least $12.7 million in donations from the Wexner Family Charitable Fund from 2016 to 2017.

- Member of the board of trustees of OSU since July 2014. Defendants A. Wexner and Gee have concurrently served at OSU as members of the board of trustees, and President Emeritus, respectively, from July 2014 to the present. Defendant Gee was also a Director of OSU's Center for Higher Education Enterprise in July 2014. Defendants A. Wexner and Schottenstein have concurrently served at OSU as member of the board of trustees and Director of the OSU Foundation, respectively, since December 2016. OSU received a total of at least $5.6 million in donations from the Wexner Family Charitable Fund from 2003 to 2013.

- Board member of the OSU Wexner Medical Center since January 2014. Defendants A. Wexner and L. Wexner have concurrently served on the Wexner Center Medical

board as member and Chairman, respectively, from January 2014 to the present. Defendants A. Wexner and Steinour have concurrently served as members of the Wexner Medical Center board from January 2014 to the present. Defendants A. Wexner and Schottenstein have concurrently served as members of the Wexner Medical Center board from at least December 2013 to the present.

120.    Defendant A. Wexner's overlapping positions and long-standing personal and professional relationships raise a reason to doubt that she would vote to initiate litigation against defendants L. Wexner, Tessler, James, Gee, Morris, Steinour, Bellinger, and Schottenstein. This lack of independence renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Demand is futile as to defendant A. Wexner.

121.    **Defendant Gee**: Defendant Gee will not vote to initiate litigation against defendant L. Wexner given their long-lasting personal relationship. Defendant Gee has stated that he is "proud to call [defendant L. Wexner] my friend." They have also been described as "close friend[s]" by the press. Defendants Gee and L. Wexner personal and professional ties include:

- Defendant L. Wexner convinced defendant Gee to accept an offer to become President of OSU, given both of their close ties to the University.

- The two have concurrently served on the OSU board of trustees as Chairman and Member from 1996 to 1997 and from 2009 to 2012.

- Defendant Gee served as President of OSU from 2009 to 2012. Defendants L. Wexner and A. Wexner donated $100 million to OSU in February 2011, during defendant Gee's service.

- Defendants L. Wexner and A. Wexner have concurrently served on the OSU Wexner Medical Center board from January 2014 to the present.

- Defendants Gee and L. Wexner have concurrently served as members of the American Academy of Arts and Sciences since 2013.

- Defendant Gee served as a Director of the Columbus School for Girls from 1990 to 1998 and 2007 to 2014. The Columbus School for Girls received a total of at least $390,000 in donations from L Brand Foundation from 2007 through 2014.

122. Further, defendant Gee has long-standing ties to defendants A. Wexner, James, and Schottenstein. These include:

- Defendant Gee served as a member of The Columbus Partnership from 2007 to 2013 concurrently with defendants A. Wexner and L. Wexner.

- Defendants Gee and A. Wexner have concurrently served at OSU as President Emeritus and member of the board of trustees, respectively, since July 2014.

- Defendant Gee has also been affiliated with several organizations that have donated to KIPP—of which defendant A. Wexner has been Vice Chair since April 2007— from at least 2009 to 2018.

- Defendants Gee and James concurrently served as Director and Trustee, respectively, of I Know I Can, a college access program in Columbus, Ohio, from 2011 to 2014. I Know I Can received a total of at least $57,000 in donations from L Brands Foundation from 2009 through 2014.

- Defendants Gee and Schottenstein have concurrently served as President Emeritus and Director of the Ohio State University Foundation, respectively, since at least December 2016.

- Defendants Gee and Schottenstein concurrently served as members of OSU's board of trustees from 2007 to 2013. They have concurrently served as Director of OSU's Center for Higher Education Enterprise and member of the board of trustees, respectively, from July 2013 to May 2014.

123. Based on defendant Gee's personal and professional ties to defendants L. Wexner, A. Wexner, James, and Schottenstein, he lacks independence, rendering presuit demand on him futile.

124. **Defendant Steinour**: Defendant Steinour has served as Vice Chair of CDDC since January 2011. As stated above, defendants L. Wexner and A. Wexner donated $25 million for the construction of the Veterans Memorial developed by CDDC. Defendants Steinour and L. Wexner have concurrently served at CDDC as Vice Chair and board member, respectively, since at least October 2016. They have also concurrently served on the Wexner Medical Center board as member and Chairman, respectively, since November 2013.

125. KIPP received donations from organizations affiliated with defendant Steinour from at least 2012 to 2018. These organizations include CDDC and Huntington Bancshares, of which defendant Steinour is Chairman, President, and CEO.

126. Further, defendant Steinour has long-standing ties to defendants A. Wexner, Morris, and Schottenstein. These include:

- Defendants Steinour, A. Wexner, and Schottenstein have concurrently served on the Pelotonia board of directors since January 2016.

- Defendants Steinour and Schottenstein have concurrently served as members of the Wexner Medical Center board since at least December 2013.

- Defendant Steinour has served as Chairman, President, and CEO of Huntington Bancshares since 2009. Huntington has a been a Pelotonia partner since March 2014, concurrent with defendant A. Wexner and Schottenstein's tenure as Managers of the Pelotonia board of directors since 2014.

- Defendants Steinour and Morris have concurrently served on the CDDC board since at least January 2011.

127.    Based on defendant Steinour's many personal and professional ties to defendants L. Wexner, A. Wexner, Schottenstein, and Morris, he lacks independence, rendering presuit demand on him futile.

128.    **Defendant Morris**: Defendant Morris has served as Chair of CDDC since February 2011, and as a board member since at least January 2008. During his tenure, defendants L. Wexner and A. Wexner donated $25 million for the construction of the Veterans Memorial developed by CDDC. CDDC also received a total of at least $38 million in donations from the Wexner Family Charitable Fund from 2013 to 2017. Defendants A. Wexner and Morris have concurrently served at CDDC as board member and Chair, respectively since at least October 2016. Furthermore, defendants Morris and Steinour have concurrently served on the CDDC Board of Directors since at least January 2011.

129.    Defendant Morris also served as Chairman, President, and CEO of American Electric Power ("AEP") from January 2004 to November 2011, and as Chairman from 2012 to April 2014. Concurrent with defendant Morris' service in multiple roles at AEP from 2011 to 2014, AEP donated to organizations affiliated with defendants A. Wexner and Gee during their tenures at the respective organizations:

| Donations with overlap between Director Defendants | | |
|---|---|---|
| Recipient Name and Related Defendant | Donation Year | Amount |
| **Columbus School for Girls** | 2012 | $150,000 |
| Defendant Gee -  Board Member (2007 - 2014) | 2011 | $150,000 |
| **KIPP Columbus Facilities Fund at the Columbus Foundation** Defendant Abigail Wexner - Vice Chair, KIPP Columbus (At least April 2007 - Present); | 2014 | $125,000 |
| **Nationwide Children's Hospital Foundation** | 2014 | $250,000 |
| Defendant Abigail Wexner - Chair (At least 2005 - July 2012); Board Member (At least 2005 - Present) | 2013 | $250,000 |

130.    Given defendant Morris' tenure at CDDC, his affiliation with AEP and its donations, and his personal and professional ties to defendants L. Wexner, A. Wexner, Gee, and Steinour, defendant Morris lacks independence, rendering presuit demand on him futile.

131.    **Defendant Schottenstein**: Defendants Schottenstein and L. Wexner concurrently served on the OSU board of trustees as member and Chairman, respectively, from December 2005 to June 2012.  They have also concurrently served on the Wexner Medical Center board as member and Chairman, respectively, since December 2013.

132.    Further, defendant Schottenstein has long-standing ties to defendants A. Wexner, Gee, and Steinour.  These include:

- Defendants Schottenstein and A. Wexner have concurrently served at OSU as Director of the OSU Foundation, and member of the board of trustees, respectively, since at least May 2016.  The have also concurrently served as Members of the Wexner Medical Center Board since January 2014.

- Defendant Schottenstein has served as Manager of Pelotonia's board of directors since April 2014.  L Brands Foundation has been a major funding partner of Pelotonia since April 2014. Pelotonia received a total of at least $300,000 in donations from the Wexner Family Charitable Fund from 2015 through 2017.

- Defendants Schottenstein and Steinour have concurrently served as members of the Wexner Medical Center board since December 2013.  Pelotonia has also been a partner of Huntington Bancshares—of which defendant Steinour has been a Partner of since January 2011—since April 2014.

- Defendants Schottenstein and Gee have concurrently served at OSU as Director and President Emeritus of the OSU Foundation, respectively, since December 2016.  They concurrently served as members of OSU's board of trustees from 2007 to 2013, and as member of the board of trustees and Director of OSU's Center for Higher Education Enterprise, respectively, from July 2014 to May 2015.  Defendant Gee was also President of OSU from October 2007 to July 2013, concurrently with defendant Schottenstein's service as member of OSU's board of trustees.

133.    These overlapping directorships and long-standing personal and professional relationships raise a reason to doubt that defendant Schottenstein would vote to initiate litigation against defendants L. Wexner, A. Wexner, Gee, and Steinour.  As a result of these entanglements, defendant Schottenstein is incapable of impartially considering a demand to commence and vigorously prosecute this action.  Accordingly, demand is futile as to defendant Schottenstein.

134.    **Defendant Bellinger**: Defendants Bellinger and L. Wexner concurrently served at Harvard Kennedy School as adjunct lecturer and senior fellow, and Co-Chair of the Leadership Council at the Center for Public Leadership, respectively, from September 2017 to May 2018. They also concurrently served at the Center for Public Leadership as Executive Director, and Co-Chair of the Leadership Council, respectively, from August 2013 to January 2017.

135.    In addition, defendant Bellinger served as Executive Director of Harvard Kennedy School Center for Public Leadership from August 2013 to January 2017, and as adjunct lecturer and senior fellow from September 2017 to May 2018.  Harvard University received a total of at least $32.5 million in donations from the Wexner Family Charitable Fund from 2015 to 2017, concurrently defendant Bellinger's service as an adjunct lecturer or Executive Director at the University.  Harvard University also received a total of at least $16,623,865 in donations from the Wexner Foundation from at least 2001 to at least November 2017.

136.    Defendants Bellinger and A. Wexner concurrently served at Harvard Kennedy School from September 2017 to May 2018, and at the Center for Public Leadership as Executive Director and Co-Chair of the Leadership Council, respectively, from August 2013 to January 2017.  Defendants Bellinger and Tessler concurrently served at Harvard Kennedy School from September 2017 to May 2018, and at the Center for Public Leadership as Executive Director and Member of the Leadership Council, respectively, from at least February 2016 to January 2017.  Based on defendant Bellinger's personal and professional ties to defendants L. Wexner, A. Wexner, and defendant Tessler, she lacks independence, rendering presuit demand on her futile.

137.    **Defendant Tessler** and defendant L. Wexner have concurrently served on the Leadership Council at the Harvard Kennedy School Center for Public Leadership as member and Co-Chair, respectively, since at least February 2016.

138.    Defendant Tessler has been a member of the board of governors for the Boys and Girls Club of America since April 2012.  BGCA received a total of at least $415,000 in donations from L Brands Foundation from 2012 through 2017, concurrently with defendant Tessler's service on the board of governors.

139.    Furthermore, as described above, defendant Tessler has long-standing ties to defendants A. Wexner and Bellinger through Harvard University.  In particular, defendants Tessler and A. Wexner have concurrently served on the Leadership Council at the Center for Public Leadership as member and Co-Chair, respectively, from at least February 2016 to the present.  Defendants Tessler and Bellinger concurrently served at Harvard Kennedy School as Member of the Leadership Council at the Center for Public Leadership, and adjunct lecturer and senior fellow, respectively, from September 2017 to May 2018.  Defendants Tessler and Bellinger concurrently served at the Center for Public Leadership as Member of the Leadership Council, and Executive Director, respectively, from at least February 2016 to January 2017.

140.    Given defendant Tessler's personal and professional ties to defendants L. Wexner, A. Wexner, and defendant Bellinger, he lacks independence.  Accordingly, demand is futile as to defendant Tessler.

141.    **Defendant James**: Defendant James has served on the board of trustees for the OSU Wexner Center for the Arts (named after defendant L. Wexner).  She is also the Co-Founder of The Center for Healthy Families, whose key partner is The Center for Family Safety – a non-profit entity founded by defendant A. Wexner.  Defendant James has been the Co-Chair of the Women's Fund of Central Ohio ("WFCO") since at least October 2010.  WFCO received a total of at least $30,000 in donations from L Brands Foundation from 2008 through 2010.

142.    Furthermore, defendant James personally donated to KIPP from at least 2012 to 2013, concurrently with defendant A. Wexner's service on the Board of Directors of KIPP. Defendants James and Gee concurrently served as Director and Trustee of I Know I Can, respectively, from 2011 to 2014.  I Know I Can also received a total of at least $57,000 in donations from L Brands Foundation from 2009 through 2014.  Given her personal and

professional ties, defendant James lacks independence. Accordingly, demand is futile as to defendant James.

143. Plaintiff has not made any demand on the other stockholders of L Brands to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) L Brands is a publicly held company with over 276 million shares outstanding and thousands of stockholders as of November 29, 2019;

(b) making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c) making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

144. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145. The Individual Defendants owed and owe L Brands fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe L Brands the highest obligation of good faith, fair dealing, loyalty, and due care.

146. The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within L Brands, and/or

consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

147. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) Victoria's Secret and PINK were having a material adverse effect on L Brands' cash flow, liquidity and debt levels; (ii) the declining performance of Victoria's Secret and PINK increased the likelihood that the Company would need to reduce its dividend; and (iii) consequently, the Company would not be able to sustain its dividend. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

148. The Director Defendants, as directors of the Company, owed L Brands the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper statements concerning L Brands' business and financial prospects. The Director Defendants knew or were reckless in not knowing that: (i) Victoria's Secret and PINK were having a material adverse effect on L Brands' cash flow, liquidity and debt levels; (ii) the declining performance of Victoria's Secret and PINK increased the likelihood that the Company would need to reduce its dividend; and (iii) consequently, the Company would not be able to sustain its dividend. Accordingly, these defendants breached their duty of loyalty to the Company.

149. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

150.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, L Brands has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

151.    Plaintiff, on behalf of L Brands, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    As a result of the Individual Defendants' failure to properly supervise and monitor the adequacy of L Brands' disclosure controls and procedures, the Individual Defendants have caused L Brands to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

154.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

155.    Plaintiff, on behalf of L Brands, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of L Brands.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to L Brands.

158.    Plaintiff, as a stockholder and representative of L Brands, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

159.    Plaintiff, on behalf of L Brands, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of L Brands, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing L Brands to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect L Brands and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Board's oversight of the Company's cash flow, liquidity, debt levels, and dividend payments;

2.    a proposal to strengthen the Company's controls over financial reporting;

3.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4.      a provision to permit the stockholders of L Brands to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of L Brands has an effective remedy;

D.      Awarding to L Brands restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 19, 2020

/s John C. Camillus
JOHN C. CAMILLUS

LAW OFFICES OF JOHN C. CAMILLUS, LLC
P.O. Box 141410
Columbus, OH 43214
Telephone: (614) 992-1000
Facsimile: (614) 559-6731
E-mail: jcamillus@camilluslaw.com

ROBBINS LLP
BRIAN J. ROBBINS (*pro hac vice* to be filed)
CRAIG W. SMITH (*pro hac vice* to be filed)
SHANE P. SMITH (*pro hac vice* to be filed)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
         csmith@robbinsllp.com
         ssanders@robbinsllp.com

Attorneys for Plaintiff